IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINE QUINLIVAN, | ) | CASE NO. 3:15-CV-731 |
| | ) | |
| Petitioner, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF | ) | THOMAS M. PARKER |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Respondent. | ) | **REPORT & RECOMMENDATION** |

## I.    Introduction

This is an action for judicial review of the final decision of the Commissioner of Social Security denying the application of plaintiff, Christine Quinlivan, ("Quinlivan") for Social Security income ("SSI").  The claim was denied initially on February 16, 2012, and upon reconsideration on August 31, 2012.  (Tr. 20)

Quinlivan had previously filed an application for SSI on July 1, 2009, which was denied after a hearing by Administrative Law Judge ("ALJ") Melissa Warner in a decision dated August 26, 2011.  (Tr. 84-94)

ALJ Ryan Glaze denied plaintiff's November 2011 application in a decision dated October 16, 2013. (Tr. 17-37)  His decision became the final decision of the Commissioner on February 14, 2015, when the appeals council denied her request for review.  (Tr. 17-37)

Given her residual functional capacity, the ALJ found that Quinlivan is unable to perform any past relevant work as a cashier (Tr. 35).  However, he determined that a significant number of jobs existed in the national economy that plaintiff could perform.  (Tr. 35-36)

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

## II.   Evidence

### A.  Personal, Educational and Vocational Evidence

Plaintiff, Christine Quinlivan, lives in a house with her husband and two children in Toledo, Ohio.  (Tr. 50-51)  At the time of the hearing, plaintiff's children were 12 years old and 18 years old.  (Tr. 51)  Plaintiff was 43 years old at the time of the hearing.  (Tr. 51)  Plaintiff had graduated from high school but had not received any other education.  (Tr. 51)  Plaintiff had previously worked as a cashier, approximately 12 years before the hearing.  (Tr. 52)  When she was working as a cashier, she worked about 30 hours per week.  (Tr. 52)

### B.  Medical Evidence

#### 1.   Medical Records Related to Physical Impairments

The relevant medical records are summarized herein.  As indicated above, plaintiff's previous application for SSI was denied on August 26, 2011.  Plaintiff sought emergency room treatment for exacerbation of low back pain and spasm in November 2011.  (Tr. 362-364)  The notes from the hospital indicate that plaintiff was requesting "strong pain meds."  (Tr. 363)  Exam findings were mostly normal.  (Tr. 364)  The notes indicate that plaintiff had normal range of motion.  (Tr. 364)  Plaintiff was given a few Vicodin for breakthrough pain and was advised to see her family doctor for follow-up.  (Tr. 367)

In January 2012, plaintiff was examined by agency consulting physician, Dr. Sushil Sethi. (Tr. 320-327)   Plaintiff's records were also reviewed by agency physician Dr. Anton Friehofner.  (Tr. 104-105)

In February 2012, plaintiff sought treatment for lower back pain from Dr. Richard

2

Schwartz.  (Tr. 328-321)  Dr. Schwartz's notes indicate that plaintiff had an antalgic gait but was able to bear full weight on each leg and could heel and toe walk without problems.  (Tr. 328-331)  She had a positive straight leg raising test for both legs, but did not "log roll" to rise.  (Tr. 328-331)  Dr. Schwartz ordered X-rays which showed mild productive bony change in the facets, most notable at L4-L5 and L5-S1.  (Tr. 374)  He also ordered an MRI which showed minimal lumbar spine facet osteoarthritis, with no significant disc bulge or stenosis.  (Tr. 339-340)

Plaintiff saw Dr. Schwartz again in July 2012 after trying physical therapy.  (Tr. 443-46)  She reported thoracic pain and showed decreased range of motion, lower extremity numbness and lower extremity weakness.  (Tr. 443)  Dr. Schwartz notes that plaintiff walked well on her toes and heels and had a negative straight leg raising test. (Tr. 445)  He also noted that she "arises with loud grunts and groans, but does so without 'log rolling,' actually quite easily."  (Tr. 445)  He noted that she made these grunting and groaning noises with any motion, even simple breathing.  (Tr. 445)  Dr. Schwartz ordered an injection of Toradol and advised plaintiff to take Aleve to relieve her pain. (Tr. 446)  Dr. Schwartz also referred plaintiff to see a pain specialist at Bay Park.  (Tr. 446)

Plaintiff began seeing Dr. Nadeem Moghal on August 20, 2012. (Tr. 472)  Exam findings showed tenderness in the left paraspinal area with muscle spasms in the left paraspinal at the thoracolumbar junction. (Tr. 474)  Dr. Moghal assessed an "unspecified myalgia and mytosis, thoracic spondylosis without myelopathy, lumbosacral spondylosis without myelopathy and of the musculoskeletal symptoms referable to limbs."  (Tr. 475)  He gave plaintiff a trigger point injection and prescribed Flexeril and Ibuprofen. (Tr. 475)

X-rays of plaintiff's thoracic spine in September 2012 showed multilevel mild degenerative changes.  (Tr. 487)  In October and November 2012, Dr. Moghal administered a

thoracic epidural steroid injection and radiofrequency ablation of the medial branch nerve block at multiple facet joints.  (Tr. 488-491)  This procedure provided some relief but plaintiff reported that she was continuing to feel spasm pain and requested a refill of her prescription for muscle relaxant pills.  (Tr. 491-492)   Dr. Moghal's exam showed muscle spasms in the paraspinal at the upper back and chest wall.  (Tr. 493)  Dr. Moghal prescribed more Flexeril on November 26, 2012, but his notes indicated that plaintiff's pill count was unacceptable.  (Tr. 494)  His notes state, "[p]atient states she stopped taking her medications and does not have her pill bottles with her."  (Tr. 494)

Plaintiff saw Dr. Moghal again in January 2013 reporting that she had twisted her back, which caused it to spasm.  (Tr. 498)  In February 2013, she was having pain in her thoracic spine and was reportedly having difficulty getting up and down from a chair. (Tr. 501)  Dr. Moghal administered three lumbar epidural steroid injections and one trigger point injection in March and April 2013.  (Tr. 504-505, 506, 510)  Dr. Moghal's notes reflect that plaintiff reported feeling better after the second and third epidurals.  (Tr. 507)  His notes from May 20, 2013 state that plaintiff was complaining of mid back pain. (Tr. 514)  The notes also indicate that Ms. Quinlivan's lumbar spine was doing better, she was sleeping fairly well and that she was working in the yard and trying to walk to lose weight.  (Tr. 514)

Plaintiff visited Dr. Moghal again on August 29, 2013.  (Tr. 536)  Dr. Moghal's notes from this visit state that plaintiff had missed her last appointment because she was taking care of her 12 year old son.  (Tr. 536)  She reported that her pain was much worse without pain medications. (Tr. 536)  Dr. Moghal prescribed pain medication and muscle relaxants to plaintiff in August 2013.  (Tr. 537-538)  Dr. Moghal completed a medical source statement for plaintiff on September 3, 2013.  (Tr. 531-532)

4

## 2.   Medical Records Related to Mental Impairments

Plaintiff started seeing psychiatrist, Dr. Irfan Ahmed, before September 2010. (Tr. 283)

Dr. Ahmed's assessment of plaintiff was that she had: 1) bipolar disorder, not otherwise

specified; 2) panic disorder, without agoraphobia; and 3) posttraumatic stress disorder ("PTSD.")

(Tr. 283)  Plaintiff's appointments with Dr. Ahmed were usually thirty minutes long, but could

last up to 45 minutes.  (Tr. 298, 465, 543)  Dr. Ahmed provided medication management,

psychotherapy, cognitive behavioral therapy and supportive therapy. (Tr. 384, 464, 542)

At an appointment in September 2011, Dr. Ahmed noted that plaintiff was somewhat

anxious, but appeared to be doing fine and exhibited no psychomotor agitation or retardation, no

paranoid delusions, and no hallucinations.  (Tr. 396)  His notes indicate that she had fair insight

and judgment.  (Tr. 396)  At an appointment in November 2011, Dr. Ahmed observed that

plaintiff's mood was dysphoric and anxious.  (Tr. 298)  He noted that plaintiff's symptoms of

anxiety and nervousness were situational in nature; her house was in foreclosure and would soon

be auctioned off.  (Tr. 298)  Dr. Ahmed's notes again reflect that plaintiff's insight and judgment

were fair.  (Tr. 298)  Dr. Ahmed continued plaintiff's medications including Geodon, Ambien,

Wellbutrin and Lexapro.  (Tr. 297)

In January 2012, plaintiff reported to Dr. Ahmed that she was doing okay, although she

was experiencing chronic back pain and still felt stressed due to financial reasons.  (Tr. 400)  Dr.

Ahmed observed that plaintiff looked "calm, relaxed and in a fair mood."  (Tr. 400)

In March 2012, plaintiff reported to Dr. Ahmed that she had stopped taking some of her

medications due to side effects.  (Tr. 402)  She reported that Gedeon had been making her tired

and sleepy and that her Lexapro had been making her sweat a lot.  (Tr. 402)  However, she

reported that, since she stopped taking Gedeon, she had had a lot of mood swings and was

5

getting irritable and snappy. (Tr. 402) She also reported that her anxiety was out of control. (Tr. 402) Dr. Ahmed noted that plaintiff's insight was fair; she was alert and oriented; and she had no psychomotor agitation or retardation. (Tr. 402) Plaintiff reported that she had no hallucinations or suicidal ideations. (Tr. 402) Dr. Ahmed resumed Abilify, discontinued Gedeon and Lexapro and continued Wellbutrin, Ambien and Klonopin. (Tr. 401) Dr. Ahmed increased the dosage of Abilify in April and again in May due to increased symptoms, including manic-like mood and increased anxiety. (Tr. 384-385)

Plaintiff presented to Dr. Ahmed again on October 17, 2012. (Tr. 460) Dr. Ahmed's notes indicate that plaintiff was in mild distress due to the pain in her lower back. (Tr. 460) Dr. Ahmed continued plaintiff's medications at this appointment. (Tr. 460)

In March 2013, when plaintiff presented to Dr. Ahmed, she reported that she had been off of her medications for the last few months. (Tr. 462) She was getting very irritable and moody and was stressing out due to chronic pain and poor sleep. (Tr. 462) Dr. Ahmed prescribed Cymbalta and Seroquel and resumed her prescription for Ambien for sleep. (Tr. 462) For the next couple of months, plaintiff was continuing to experience symptoms of sadness and anxiousness. (Tr. 464) She was having panic attacks and had problems sleeping. (Tr. 464) In early May 2013, plaintiff was very irritable and anxious and Dr. Ahmed reported that "her anxiety is out of control." (Tr. 466) Dr. Ahmed's notes from early May 2013 also report that plaintiff reported a spending spree. (Tr. 466) Dr. Ahmed continued to adjust her medications. (Tr. 464, 466)

By May 24, 2013, plaintiff's mania symptoms were resolving. (Tr. 468) Dr. Ahmed's notes indicate that she was in a fair mood and that she was eating and sleeping well. (Tr. 468) However, in June 2013, plaintiff was in an irritable mood again and had been agitated due to the

chronic pain in her lower back.  (Tr. 470)  Dr. Ahmed increased her Seroquel prescription and continued her other medications.  (Tr. 470)

In August 2013, plaintiff was very anxious and stressed out due to her home situation. (Tr. 542)  Her son had fallen from his bike and had multiple fractures.  (Tr. 542)  She was getting very moody and irritable and had gained weight on Seroquel.  (Tr. 542)  Dr. Ahmed changed her prescription from Seroquel to Gedeon, increased her Klonopin prescription and continued her other medications.  (Tr. 542)  Dr. Ahmed completed a medical source statement for plaintiff on September 11, 2013.  (Tr. 533-535)

### C.  Opinion Evidence

#### 1.  Dr. Moghal  – Treating Physician

On September 3, 2013, Dr. Moghal completed a medical source statement as Ms. Quinlivan's treating physician. In this statement, Dr. Moghal opines that plaintiff could reasonably stand/walk for 15 minutes at a time and for a total of two hours in an eight hour workday.  (Tr. 531)  His statement also indicates that she can sit for 15 minutes at a time and for a total of two hours per day.  (Tr. 531)  Dr. Moghal stated that Ms. Quinlivan could not alternate between sitting and standing/walking because she was required to "lay prone for thirty minutes prior to resuming activity."  (Tr. 531)  His opinion limits her ability to lift and carry to less than five pounds occasionally.  (Tr. 531)  He opined that she would need to lie down for more than two hours in an eight hour workday.  (Tr. 532)  He also states that she could only occasionally finger, handle, reach, operate hand controls or tolerate heat, and was incapable of balancing, stooping/bending, climbing stairs/steps, walking on uneven ground, operating foot controls, working around hazardous machinery, operating a motor vehicle, or tolerating cold, dust, smoke or fumes.  (Tr. 531-532)  He states that Ms. Quinlivan did not need an assistive device to walk.

7

(Tr. 531-532)  Dr. Moghal's statement indicates that plaintiff's pain is severe and that the objective evidence supporting this degree of pain was that she exhibited spinal scoliosis and osteoarthritis.  (Tr. 532)  He also indicated that she was taking pain medication that would adversely affect her work performance. (Tr. 532)  His notes indicate that she would have decreased focus and attention while taking Zanaflex and Oxycodone.  (Tr. 532)

### 2.  Dr. Irfan Ahmed – Treating Psychiatrist

Dr. Ahmed completed a medical source statement concerning plaintiff's mental impairments on September 11, 2013.  (Tr. 533-535)  In his statement, Dr. Ahmed opined that plaintiff would have difficulty maintaining attention and concentration and would be unable to stay on task even 80% of a workday.  (Tr. 533)  He also concluded that she would be 15% to 25% less productive than an unimpaired worker.  (Tr. 534)  He opined that she was likely to miss work one to three times per month.  (Tr. 534)  He stated that plaintiff's medications would make her tired and sleepy.  (Tr. 535)

### 3.  Dr. Sushil M. Sethi – Consulting Physician

In January 2012, plaintiff was examined by consulting physician, Dr. Sushil Sethi. (Tr. 320-327)  His examination showed normal range of motion of plaintiff's cervical and thoracic spines; some tenderness and reduced range of motion in her lumbar spine area, but no guarding and no spasm; normal range of motion in her hips; normal gait, the ability to squat and heel and toe walk; normal motor and sensory response and normal deep tendon reflexes; reduced range of motion and bony crepitus in both knees; mild tenderness in the AC (acromioclavicular) joint; moderate tenderness at L4-5 and S1.  (Tr. 321-322)  X-rays of the thoracic spine showed mild anterior osteophytes at T4 and facet changes at T7-8.  (Tr. 322)  Based on his examination, Dr.

8

Sethi believed that Ms. Quinlivan could perform medium work exertionally.  (Tr. 322)  He also opined that she would be able to sit four to six hours, walk two to three hours, and lift up to 25 pounds frequently and 50 pounds occasionally.  (Tr. 322)

### 4.  Agency Reviewers

Also in January 2012, Dr. Anton Friehofner reviewed the file and concluded that plaintiff could perform medium level work, with frequent stooping and frequent climbing of ladders, ropes and scaffolds.  (Tr. 104-105)

Dr. Leanne M. Bertani also reviewed plaintiff's filed on August 15, 2012 and agreed with Dr. Friehofner's assessment.  (Tr. 116-118)

On February 13, 2012, state agency reviewer, Patricia Semmelman, Ph.D., adopted the psychiatric review technique and mental residual functional capacity from ALJ Warner's August 2011 decision. (Tr. 103, 106)  ALJ Warner found that Ms. Quinlivan had the mental RFC to work at jobs that required a specific vocational preparation level of one to two; no contact with the general public; and rare contact with co-workers.  (Tr. 89)  Dr. Semmelman concluded that there were no significant changes in the medical record since ALJ Warner's decision and thus adopted her findings pursuant to Acquiescence Rule 98-4(6).

In August 2012, state agency reviewer, Carl Tishler, Ph.D., reviewed the file and adopted the mental findings from ALJ Warner's August 2011 decision.  (Tr. 115, 118)

### D.  Testimonial Evidence

#### 1.  Quinlivan's Testimony

A hearing took place in this matter on September 12, 2013.  (Tr. 43)  Ms. Quinlivan was represented by counsel at the hearing.  (Tr. 45)  Ms. Quinlivan testified that she lives in a house with her husband and two children, ages 12 and 18.  (Tr. 51)  Ms. Quinlivan graduated from high

school. (Tr. 51)  She was 43 years old at the time of the hearing.  (Tr. 51)  She had prior experience working as a cashier.  (Tr. 52)

Plaintiff testified that she was unable to work due to her pain, her poor memory, and her inability to concentrate or lift anything.  (Tr. 53-54)  Her pain is located in her middle and lower back.  (Tr. 54)  Ms. Quinlivan described her pain as a sharp pain between a 7 and 8.  (Tr. 54-55)  She also testified that she has spasms in her back.  (Tr. 55)  She complained of muscle spasms when bending.  (Tr. 65)   Plaintiff testified that she has had several treatments to relieve her pain. (Tr. 55)  She stated that epidural shots provide some relief and that her pain medication, oxycodone, takes the edge off of her pain.  (Tr. 55)  She also stated that medication for muscle relaxers helps a little bit.  (Tr.  56)  However, plaintiff testified that she has side effects from the medication, including trouble concentrating and remembering things.  (Tr. 56-57)  However, plaintiff also related her difficulty concentrating and remembering to her mental impairments. (T. 57)

Plaintiff stated that she has ADHD and is bipolar.  (Tr. 57)  She testified that she has periods of being depressed and periods of being manic.  (Tr. 57-58)  Plaintiff testified that, when she is manic, she starts cleaning and her OCD kicks in.  (Tr. 58)  She testified that she sees Dr. Ahmed for her mental health issues.  (Tr. 58)  She also sees a counselor once a month. (Tr. 59) Plaintiff has trouble sleeping and takes medication to help with her sleeping.  (Tr. 59)  She also reported having anxiety attacks, for example when she is lying on the couch and watching television.  (Tr. 59)  She indicated that she sometimes has panic attacks three times a day.  (Tr. 60)

Plaintiff testified that she has problems being around people and rarely leaves her house. (Tr. 60)  She stated that she is afraid of leaving her house because she fears that she will see the

man who raped her when she was 21 years old.  (Tr. 60)  Her husband does the grocery shopping.  (Tr. 60)  Plaintiff acknowledged that she goes to doctor appointments, but that she takes her mother with her.  (Tr. 60-61)  She also admitted that she goes to activities that her sons have at school.  (Tr. 61)  Plaintiff testified that she has never had a drivers' license and is afraid of driving.  (Tr. 66)

Plaintiff testified that she takes medication for her mental conditions. (Tr. 61)  However, she often will stop taking her medication or forget to take it.  (Tr. 61-62)

Plaintiff stated that she often had bad thoughts.  (Tr. 62)  She described these bad thoughts like she had "demons living inside" her.  She reported that they were "telling me to kill myself; that I'm not worth living."  (Tr. 62)

Plaintiff testified that she was unable to lift things, such as a laundry basket.  (Tr. 63) She stated that she was able to lift a gallon of milk but that it sometimes hurt her lower back. (Tr. 64)  She testified that she was able to walk for about 10 minutes.  (Tr. 64)  She was unable to walk more than that due to pain in her back.  (Tr. 64)  She testified that she has to lie down on her stomach to relieve the pain in her back.  (Tr. 64)  She testified that she is able to stand for about five minutes before she needs to shift around and lean against walls.  (Tr. 64-65)

Plaintiff testified that, when she cleans the house, she has to do so in stages.  (Tr. 65)  She does the dishes, then lies down.  (Tr. 65)  She sweeps and mops the floor, then she lies down. (Tr. 65)  She stated that each task can be done for about five minutes before she takes a break. (Tr. 65)

Plaintiff testified that she sees Dr. Moghal once a month. (Tr. 67)  When questioned by the ALJ, plaintiff admitted that her back pain had lessened in February 2013.  (Tr. 68)  She explained that sometimes her back feels good and sometimes it feels bad.  (Tr. 68)  When

11

questioned about a medical note indicating that she was walking to lose weight, plaintiff testified

that she had been walking a couple of blocks before she had to stop due to pain.  (Tr. 69)  She

testified that she had been trying to do that two times per week, but is no longer trying to walk.

(Tr. 69)  With regard to a medical note indicating that she had been doing yard work, plaintiff

testified that she had only been watering her flowers.  (Tr. 69)

### 2.  Vocational Expert Testimony

Susan Lyons, a vocational expert, also testified during the hearing.  (Tr. 70-78)  For the

first hypothetical question, Ms. Lyons was instructed to assume a hypothetical individual who

was situated vocationally like plaintiff.  She could perform functions of medium work except

that she should only occasionally climb ramps, stairs, stoop, kneel, crouch, and crawl, but never

climb ladders, ropes or scaffolds.  (Tr. 71)  The hypothetical individual was also limited to work

within a specific vocational preparation of one to two. (Tr. 71)  She could understand, carry out,

and remember simple instructions and make judgments on simple work and respond

appropriately to usual work situations and changes in routine work setting.  (Tr. 71)  The

individual could respond appropriately with supervision but could not have contact with the

general public and was not precluded from but could have rare contact with coworkers.[1]  (Tr. 71-

72)

Considering this first hypothetical, Ms. Lyons opined that the individual would be able to

perform unskilled medium work such as a dishwasher, with 11,000 regional jobs and 282,000

nationally.  (Tr. 73)  She also testified that the individual would be able to work at a packaging

position with approximately 2,400 jobs available locally and 41,000 occurring nationally.  (Tr.

---

[1] "Rare" was further clarified by the ALJ to mean "dispensing and sharing factual information not likely to generate
an adversarial setting."

73)  She also thought that the described individual could fill a stock handler position, with approximately 3,900 jobs available regionally and 92,000 nationally.

The vocational expert was then asked if the individual was limited to light exertional level if there would be jobs such an individual could perform.  (Tr. 76)  The VE opined that such a person would be able to perform assembly work at a bench or table. (Tr. 76)  She testified that there were 4,800 jobs available regionally and 92,000 nationally.  (Tr. 76)  Such a person would also be able to fill a packaging position at a bench or table, with 4,700 jobs available regionally and 100,000 nationally.  (Tr. 76)  The VE also thought that such a person could perform an inspection job done at a bench or a table, with approximately 1,900 jobs available regionally and 30,000 occurring nationally.  (Tr. 76)

Next, the VE was asked if the hypothetical individual could only stand or walk two hours and sit for two hours in an eight hour workday, if there would be jobs available for such a person.  (Tr. 76-77)  With these limitations, the VE testified that no jobs would be available.  (Tr. 77)  The VE testified that typically workers were permitted to take a 15 minute break in the first half of the day and a 15 minute break in the latter half of the day and a 30 to 60 minute break for lunch.  (Tr. 77)  She also testified that the normal tolerance for absenteeism in these jobs was between one and two days a month.  (Tr. 77)  The VE opined that there was an expectation of an individual being on task 91% of the time in these positions.  (Tr. 77)  She also testified that a person would not be permitted to lie down during the course of a work day unless it was done on a scheduled break.  (Tr. 78)

### III.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial

13

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

> 1. If the claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[13] claimant is presumed disabled without further inquiry.
>
> 4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v.*

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

*Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

at Step Five to produce evidence to establish whether the claimant has the RFC and vocational

factors to perform work available in the national economy. *Id.*  At all times, the ultimate burden

of proof remains upon the claimant.

**IV.    The ALJ's Decision**

The ALJ issued a decision on October 16, 2013.  A summary of his findings is as

follows:

1.  Quinlivan had not engaged in substantial gainful activity since November 15, 2011, the application date.  (Tr. 23)
2.  Quinlivan has the following severe impairments: bipolar and panic disorder without agoraphobia; posttraumatic stress disorder; social phobia; obsessive compulsive disorder; degenerative disc disease of the thoracic and lumbar spine; and minimal osteoarthritis of the lumbar and thoracic spine.  (Tr. 23)
3.  Quinlivan does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (Tr. 23-24)
4.  Quinlivan has the residual functional capacity ("RFC") to perform less than a full range of medium work as defined in 20 CFR 416.967(c) in that she can never climb ladders, ropes or scaffolds and occasionally climb ramps and stairs, kneel, crouch, stoop, and crawl.  She is limited to work with a specific vocational preparation ("SVP") of 1-2 but can understand, remember, and carry out simple instructions, make judgments on simple work, and respond appropriately to usual work situations and changes in routine work settings. She can respond appropriately with supervision and can have rare (not precluded but less than occasional) superficial interaction with coworkers on trivial matters (dispensing and sharing factual information) but must not have contact with the general public.  (Tr. 25-35)
5.  Quinlivan is unable to perform any past relevant work.  (Tr. 35)
6.  Quinlivan was born on December 30, 1969 and was 41 years old, which is defined as a younger individual age 18-44 on the date the application was filed.  (Tr. 35)
7.  Quinlivan has at least a high school education and is able to communicate in English.  (Tr. 35)
8.  Transferability of job skills is not material to the determination of disability because Quinlivan's past relevant work is unskilled.  (Tr. 35)
9.  Considering Quinlivan's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform.  (Tr. 35-36)

Based on the foregoing, the ALJ determined that Quinlivan had not been under a disability since November 15, 2011 the day the application was filed.  (Tr. 36)

## V.  Arguments Presented

Plaintiff filed her brief on the merits on August 17, 2015.  (Doc. 14)  Ms. Quinlivan argues that the ALJ erred in his evaluation of the opinion of plaintiff's treating physician, Dr. Nadeem N. Moghal.  (Doc. 14, pp. 11-15)  Plaintiff contends that the ALJ erred by failing to assign controlling weight to plaintiff's treating physician.  (Doc. 14, p. 12)  She further argues that the ALJ improperly placed a more rigorous scrutiny on the opinion of plaintiff's treating physician than on the opinion of the non-treating, examining physician, to which the ALJ assigned great weight.  (Tr. 27)  Plaintiff also points out that she began treating with Dr. Moghal, her treating physician, after she was examined by Dr. Sethi and after the agency reviewers reviewed her records.  For this reason, the agency physicians did not review her treating physician's records, making their opinions less reliable.  (Doc. 14, p. 13)  Plaintiff also argues that the ALJ's evaluation overstated the record and ignored evidence that supported Dr. Moghal's opinion.  Plaintiff contends that the ALJ's decision improperly considered the possibility that Dr. Moghal was "giving in" to his patient's demands rather than accurately reflecting her impairments.  (Doc. 14, pp. 17-18)

Plaintiff also argues that the ALJ improperly evaluated the treating psychiatrist's opinion. (Doc. 14, pp. 18-20)  The ALJ assigned little weight to plaintiff's treating psychiatrist because he determined that the psychiatrist's opinion was not supported by the evidence in the record. Plaintiff argues that the ALJ did not assign the proper weight to the treating psychiatrist's opinion and instead relied on the opinions of the reviewing psychological consultants.  Plaintiff also points out again that these agency reviewers did not have access to plaintiff's entire medical

16

record.  (Doc. 14, p. 19)

Defendant filed a brief on November 2, 2015.  (Doc. 16)  Defendant argues that the ALJ's decision to discount Dr. Moghal's opinion was supported by sufficiently specific reasoning spanning more than a full page of the ALJ's decision.  Defendant argues that the ALJ was not required to address every factor identified by the agency for discounting the treating physician's opinion.  Defendant argues that the ALJ's decision was consistent with the record as a whole.  (Doc 16, pp. 9-10)  Defendant contends that the ALJ properly discounted Dr. Moghal's opinion.  (Doc. 16, pp. 10-12)

Defendant also argues that the ALJ properly discounted Dr. Ahmed's opinion. (Doc 16, pp. 12-13)  Defendant argues that the ALJ was not required to address every regulatory factor when discounting Dr. Ahmed's opinion. Defendant contends that the ALJ's decision to assign little weight to Dr. Ahmed's opinion was supported by sufficiently specific reasoning.  The ALJ explained that he was giving only limited weight to Dr. Ahmed's opinion because it was inconsistent with his clinical findings and Ms. Quinlivan's own reports of her daily activities and condition.

Plaintiff filed a reply brief on November 16, 2015.  (Doc. 17)  Plaintiff restates the arguments presented in her brief on the merits.  She argues that, in rejecting the opinions of the treating physician and psychiatrist, the ALJ did not follow the treating physician rule of the social security regulations.  The court will further consider the parties' arguments below.

## VI.    Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.

*See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."  *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th

Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B. Treating Physician Rule

Plaintiff argues that the ALJ did not state valid reasons for failing to assign controlling weight to the opinion of plaintiff's treating physician.  The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  In making determinations of disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and

19

laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)-(6).  The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007).  The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661

F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). As the Sixth Circuit has noted,

> the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id*. at 377. On the other hand, the ALJ is not obligated to provide an "exhaustive factor-by-factor analysis." See *Francis v. Comm'r of Soc. Sec.* 414 Fed. Appx. 802, 804 (6th Cir. 2011).

In coming to the decision that Quinlivan has the residual functional capacity to perform less than a full range of medium work limited to a specific vocational preparation of 1-2, the ALJ did not afford controlling weight to Drs. Moghal's and Dr. Ahmed's opinions regarding Ms. Quinlivan's limitations. (Tr. 25-35) The ALJ provided a detailed explanation as to how he arrived at this conclusion. (Tr. 25-35)

In considering Dr. Moghal's medical source statement, the ALJ included the following reasons in his lengthy explanation for assigning little weight to Dr. Moghal's opinion:

> * * * the objective evidence only shows mild or minimal findings and she was often found to have a normal gait, being capable of walking on her toes and heels, and often negative straight leg raising. (Tr. 31)

> * * * the record shows that the claimant has engaged in histrionic behavior.

Specifically, the record reveals that Dr. Schwartz's records showed the claimant to exhibit loud grunts and groans when attempting to rise but was able to do so without any log rolling and quite easily. * * * The undersigned notes that the claimant also fell during the hearing and exhibited groaning activity although she acknowledged that she was able to continue. (Tr. 31-32)

* * * the claimant is capable of engaging in activities greater than alleged. The above record shows that the claimant cares for her household and children (earlier this year she informed Dr. Georgiev that she did everything in the home). In fact, she recently had to provide significant care for her youngest son who had a severe injury in that he had fractured his distal tibia and fibula – care that she described as providing constant assistance. The claimant was also walking for exercise, including participating in a cancer walk. She was exercising and doing yard work. The undersigned acknowledges that the claimant at the hearing characterized this activity as watering her flowers but attaches little credence to this statement as generally a person would make such a distinction in general conversation and specifically in reporting abilities and limitations doctors. (Tr. 32)

* * * The claimant's activities do not support an ability to only sit or stand/walk for a maximum of 2 hours each during an 7 hour workday. The claimant in her own testimony acknowledged that she could lift a gallon of milk (although she testified to difficulty) and the relatively mild objective findings support a determination that she can lift up to 50 pounds occasionally and perform the walking/standing and sitting requirements of medium work activity with the assigned postural limitations. The record does not support a need to lie down for a significant time period and the doctor specifically noted that the claimant did not require the ability to alternate positions. The record does not support the need for environmental limitations as set forth by Dr. Moghal as the record does not show any balance issues or difficulty dealing with environmental pollutants. Generally, the objective record which shows overall mild findings along with her activities does not support the significant and excessive restrictions imposed by the doctor. The doctor's statement regarding medication side effects is also not given any credence as he simply stated that the medication *could* result decreased [sic] focus and attention – not that the medication did impose these limitations. (Tr. 32)

The court should find that the ALJ's decision to assign little weight to Dr. Moghal's opinion is supported by the evidence in the case record. The ALJ has provided a sufficiently specific explanation as to why he assigned little weight to this opinion.

The ALJ also provided a detailed explanation for his decision to assign limited weight to

22

Dr. Ahmed's opinion.  (Tr. 33-35)  His explanation includes the following statements:

> * * *  The record shows that the claimant consistently failed to take her
> medication.  The fact that she testified that she would "forget" and then remember
> when she started exhibiting symptoms supports the determination that her
> symptoms are largely controlled via her medication.  Moreover, the record often
> shows the claimant to have a steady mood when she was generally able to
> perform her household tasks along with caring for her husband and children even
> when she was not taking her medication.  On several occasions, her issues were
> situational and dealt with family issues concerning her children or were related to
> her alleged issues of pain.  It also appears that for at least a majority of the time
> Dr. Ahmed was only seeing the claimant during medication management sessions.
> (Tr. 33)

> * * *  his findings are not supported by the aforementioned objective record that
> has consistently shown the claimant to be alert and oriented with an intact
> memory, attention, and concentration and generally normal psychomotor activity.
> She also has had generally fair insight and judgment.  Consequently, these
> objective findings do not correspond with an individual who has the significant
> limitations set forth by Dr. Ahmed.  Additionally, there is no evidence that the
> claimant would miss 1-3 days of work a month due to her symptoms given the
> fact that as recently as September the claimant was reporting that despite family
> stressors she was doing good and had been able to maintain her household despite
> any symptoms.  (Tr. 33-34)

The court should find that the ALJ's decision to assign little weight to Dr. Ahmed's

opinion is supported by the evidence in the case record.  The ALJ has provided a sufficiently

specific explanation as to why he assigned little weight to this opinion.

The ALJ also considered plaintiff's statement that she had demons inside her and noted

that the record did not reveal any hallucinations or thoughts of suicide.  (Tr. 34)  The ALJ

recognized that plaintiff had some issues in dealing with others, but that these issues were taken

into account, as was her fear of encountering her rapist.  (Tr. 34)  Her work was limited to a SVP

of one or two to take into account the limitations which the ALJ found were supported by the

objective evidence in the record.  (Tr. 34)

In her brief, plaintiff also argues that the ALJ erred in assigning great weight to the

opinion of Dr. Sethi, who examined her at the request of the state agency, and to the non-examining physicians who reviewed her file before she treated with Dr. Moghal.  (Doc #14, pp. 12-13)  While the ALJ was not permitted to rely upon the opinions of non-examining reviewers to offset the treating source opinions, the regulations permit the judge to consider their opinions. See 20 C.F.R. § 404.1516(b) (1980); *Sullivan v. Weinberger,* 493 F.2d 855, 859-860 (5th Cir. 1974), cert. denied, 421 U.S. 967, 44 L. Ed. 2d 455, 95 S. Ct. 1958 (1975).  Their opinions were additional evidence to be considered by the judge along with other "medical evidence" in reaching an independent determination. *Id.* Here, the ALJ pointed to specific evidence in the medical records and determined that the opinions of the treating physician and treating psychiatrist were inconsistent with the objective medical findings.  He thoroughly explained his reasoning for assigning little weight to their opinions and these reasons were not simply that their opinions differed with the reviewing physicians.  The court concludes that there was substantial evidence supporting the ALJ's decision to assign little weight to the treating physician irrespective of the weight he assigned to Dr. Sethi and the physicians who reviewed plaintiff's records at the request of the agency.

**VII.    Conclusion**

In summary, a review of the record supports the finding that the ALJ properly considered and weighed the evidence, including the medical opinion evidence of Ms. Quinlivan's treating physicians.  The ALJ's decision is supported by substantial evidence.  Ms. Quinlivan has not demonstrated a basis upon which to reverse or remand the Commissioner's decision.  For these reasons, the it is recommended that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. § 405(g).

Dated: May 10, 2016                                    s/ Thomas M. Parker
                                                                   United States Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order.